54 F.3d 802
 149 L.R.R.M. (BNA) 2285, 311 U.S.App.D.C.
398, 63 USLW 2750,
130 Lab.Cas. P 11,336
 LEACH CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Association of Machinists and Aerospace
Workers, District Lodge 94, Local Lodge 102,
AFL-CIO, Intervenor.
 No. 93-1707.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 24, 1995.
Decided May 12, 1995.
 
 William H. Emer, Los Angeles, CA, argued the cause for petitioner. With him on the briefs was Kelly F. Watson, Los Angeles, CA.
 Robert J. Englehart, Atty., N.L.R.B., Washington, DC, argued the cause for respondent. With him on the brief were Linda R. Sher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel and Linda Dreeben, Supervisory Atty., N.L.R.B., Washington, DC.
 Allison Beck, Washington, DC, was on the brief for intervenor. Ira R. Mitzner, Washington, DC, entered an appearance.
 Before WILLIAMS, SENTELLE and ROGERS, Circuit Judges.
 Opinion for the court filed by Circuit Judge ROGERS.
 Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS.
 ROGERS, Circuit Judge:
 
 
 1
 Petitioner Leach Corporation seeks review of an order of the National Labor Relations Board finding Leach liable for unfair labor practices under Secs. 8(a)(5) & (1) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(5) & (1), in connection with its relocation of a manufacturing operation.[1] Leach contends that the Board erred in ruling that the collective bargaining contract applied to workers at the new facility notwithstanding the company's adoption of a different manufacturing process, and in rejecting its affirmative defense that the charge filed by the Union[2] was untimely under Sec. 10(b) of the Act, 29 U.S.C. Sec. 160(b). We deny the petition for review and grant the Board's cross-application for enforcement of its order.
 
 I.
 
 2
 Leach manufactures relay devices, a type of electronic switch used primarily in the aerospace industry. It had a longstanding collective bargaining relationship with the Union covering production and maintenance employees at a manufacturing facility known as the Los Angeles Relay Division ("Los Angeles"). The outstanding collective bargaining contract extended through October 22, 1991.
 
 
 3
 Relay production at Los Angeles, laid out over 14 buildings, operated according to a relatively inefficient manufacturing method known as "batch" production. In 1990, Leach decided to change its relay manufacturing process from the batch method to the more flexible and efficient "just-in-time" system. Due to physical limitations at the Los Angeles site, however, the company elected to close the plant and relocate the relay division to a pre-existing Leach facility in Buena Park, 19 miles away. Leach notified the Union in February 1991 of the plans to transfer the relay division, advising that the closure and relocation would commence in July and be completed in September. During the period leading up to the move, representatives of Leach and the Union met several times to discuss the new operation. At a March 20 meeting, Leach informed the Union that it would not extend the collective bargaining contract to Los Angeles employees who relocated to Buena Park due to the different nature of relay production there, and Leach denied the Union's request to view the Buena Park premises. At each of these meetings, the Union also requested that Leach recognize it as the representative of relocating employees, and Leach refused. On June 26, Leach denied the Union's request for the names, departments and positions of the employees to be relocated.
 
 
 4
 The relocation process commenced on July 3, when the first 35 Los Angeles workers began work at Buena Park, and continued until completion on September 17. In all, approximately 280 of the 340 Los Angeles unit employees had been transferred. Except for the 35 employees who relocated on July 3, the record does not reveal the number of employees transferred on any particular date. When the relocation was complete, the new relay production line at Buena Park consisted entirely of former Los Angeles relay workers, and the old facility was closed.
 
 
 5
 On January 21, 1992, the Union filed a charge with the Board alleging that Leach had unlawfully repudiated the contract and withdrawn recognition of the Union in violation of Secs. 8(a)(5) & (1). An Administrative Law Judge ("ALJ") found that the Buena Park relay operation was substantially the same as production at Los Angeles, notwithstanding the different manufacturing methodology at Buena Park and the concomitant need for worker retraining. 312 N.L.R.B. at 995-96. Because Los Angeles transferees made up significantly more than 40 percent of the relevant relay unit at Buena Park, the ALJ ruled that the relocation did not relieve Leach of its collective bargaining obligation with respect to the transferred Los Angeles employees. Id. at 995-96 & n. 3. The ALJ also found that Leach's refusal to provide information to the Union about the relocation process constituted an unfair labor practice in violation of Secs. 8(a)(5) & (1). Id. at 996.[3] However, the ALJ ruled that because the unfair practice occurred on July 3, when the first group of Los Angeles employees actually relocated to Buena Park, the Union had filed its charge more than six months later and it waS THEREFORE UNTIMELY UNDEr Sec. 10(b).[4] id. at 996-98. Accordingly, while ordering Leach to cease and desist from refusing to provide requested information to the Union, the ALJ declined to enter an order regarding the withdrawal of recognition and contract repudiation charges. Id. at 998.
 
 
 6
 The Board reversed the ALJ's decision on the Sec. 10(b) time-bar, ruling that the limitations period began at the earliest on September 17--"the date the transfer process was substantially completed." Id. at 991. Rejecting Leach's argument that Sec. 10(b) was triggered prior to the relocation, the Board noted that "a statement of intent or threat to commit an unfair labor practice does not start the statutory six months running. The running of the limitations period can begin only when the unfair labor practice occurs." Id. at 991 & n. 7 (internal quotations and citations omitted). The Board emphasized that the Sec. 10(b) period begins to run "only when a party has clear and unequivocal notice of a violation of the Act," and that the party asserting the Sec. 10(b) defense bears the burden of demonstrating such notice. Id. at 991.
 
 
 7
 Applying this principle to Leach's relocation, the Board determined that Leach had failed to show that the Union "had knowledge of the facts necessary to support a ripe unfair labor practice charge on July 3," when the relocation began. Id. In reaching this conclusion, the Board looked to the point at which Leach could be found to have committed an unfair labor practice. When an employer relocates a business, the Board has held that an existing contract remains in effect if (1) transferees from the old plant comprise a "substantial percentage" of employees in the relevant bargaining unit at the new plant, and (2) operations at the new facility are "substantially the same" as those at the old plant. Rock Bottom Stores, Inc., 312 N.L.R.B. 400, 402, 1993 WL 382095 (1993), enf'd, NLRB v. Rock Bottom Stores, 51 F.3d 366 (2d Cir.1995); Harte & Co., 278 N.L.R.B. 947, 948, 1986 WL 68757 (1986). For a gradual plant relocation involving new hires or other non-transferred workers, the Board has adopted a rule that the appropriate time for measuring whether the "substantial percentage" is met is when the relocation has been "substantially completed," rather than when the new plant becomes operational. Harte, 278 N.L.R.B. at 949. In the Board's view, this rule represents a workable balance between "the newly hired employees' interest in choosing whether or not to have union representation" and "the transferees' interest in retaining the fruits of their collective activity." Id. at 950.
 
 
 8
 The Board treated the gradual relocation of Leach's Los Angeles employees to the pre-existing Buena Park facility, where approximately 100 non-union workers were already employed, as a situation governed by Harte. Thus, it determined that Leach became obligated to recognize the Union and the contract at Buena Park only when the relocation had been substantially completed. Consequently, "on this record," Sec. 10(b) could not be triggered until that point, as only then would "sufficient facts [be] in existence to sustain a finding of an unfair labor practice." 312 N.L.R.B. at 991. In view of the absence of data about how many employees were transferred on any particular day after July 3, the Board concluded that "September 17 is the earliest date on which the Union can be found to have had clear and unequivocal notice that Harte 's substantial-percentage-of-transferees requirement had been fulfilled." Id. at 992. The Board also found that the Union's lack of knowledge could not be attributed to its failure to seek information about the relocation, but rather was due in part to Leach's unlawful refusal to provide the requested information. Id. at 992 n. 8. The Board upheld the ALJ's findings and conclusion that Leach had violated Secs. 8(a)(5) and (1) by repudiating its contract and withdrawing recognition of the Union, and ordered Leach, among other things, to recognize the Union at Buena Park as the exclusive collective bargaining representative for the transferred employees engaged in manufacturing relays, and to apply the terms of the contract with the Union. Id. at 992-93.II.
 
 
 9
 Leach contends that the Board erred in determining when the Sec. 10(b) limitation period commenced to run with respect to the Union's non-recognition and refusal-to-bargain charges. The Board's interpretation of Sec. 10(b), provided it is reasonable, is entitled to judicial deference. See Drug Plastics & Glass Co., Inc. v. NLRB, 44 F.3d 1017, 1021 (D.C.Cir.1995) (on petition for rehearing) (deferring to Board interpretation of Sec. 10(b) and citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)); see also Pittsburgh Press Co. v. NLRB, 977 F.2d 652, 654-55 (D.C.Cir.1992). With respect to the Board's application of its interpretation to particular facts, the court "must uphold the Board's determination unless it has acted arbitrarily or otherwise erred in applying established law to the facts at issue." Pittsburgh Press Co., 977 F.2d at 654 (internal quotations and citations omitted). Thus, the court will affirm a decision of the Board "if it is reasonably defensible" and supported by substantial evidence on the record. Id. At the same time, the Board must provide a reasoned justification for any departure from its prior policies or practices. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983); Cleveland Constr., Inc. v. NLRB, 44 F.3d 1010, 1016 (D.C.Cir.1995).
 
 
 10
 Leach first maintains that the Board erred in ruling that Sec. 10(b) could not be activated by the company's unequivocal notice of intent to commit an unfair labor practice in the future. Leach relies primarily on United States Postal Service Marina Mail Processing Center, 271 N.L.R.B. 397, 1984 WL 36629 (1984), a discriminatory discharge case in which the Board stated that it would henceforth focus "on the date of the alleged unlawful act, rather than on the date its consequences become effective." Id. at 399-400. Leach contends that under Postal Service, the company's statements to the Union that Leach would not recognize the Los Angeles contract at Buena Park should have triggered Sec. 10(b) in May, and that the application of a different rule here constitutes an arbitrary departure from prior agency practice.
 
 
 11
 The Board rejected this argument, describing Leach's reliance on Postal Service as "misplaced":
 
 
 12
 The 10(b) standard that was employed in Postal Service applies to discriminatory discharge cases, but not to situations like those at issue here, involving contract repudiation and refusal to bargain.
 
 
 13
 312 N.L.R.B. at 991 n. 7. The Board cited two decisions in which it had limited the Postal Service standard to cases involving a charge of discriminatory termination. See United States Can Co., 305 N.L.R.B. 1127, 1141, 1992 WL 10097 (1992); Howard Electrical & Mechanical, 293 N.L.R.B. 472, 475, 1989 WL 223913 (1989). Thus, while its discussion was terse, the Board explained and defended its departure from the rule in Postal Service. See International Bhd. of Elec. Workers v. ICC, 862 F.2d 330, 339 (D.C.Cir.1988).
 
 
 14
 In addition, the Board's decision not to apply Postal Service in the relocation context was reasonable. Postal Service itself emphasized that the Board did not "consider or discuss, what, if any implications" its notice rule might have in other contexts. See Postal Service, 271 N.L.R.B. at 401. More importantly, the decision in Postal Service assumed that the illegal action in a discriminatory discharge case is complete at the time that the employer makes the final decision to terminate and communicates that decision to the employee. In the business relocation context, by contrast, whether an employer must recognize a prior collective bargaining agreement at the new site depends, among other things, on the number of employees transferred and the continuity of operations. Thus, an employer's stated intent not to bargain following a plant relocation is insufficient standing alone to constitute an unfair labor practice. Rather, additional action must be taken and information obtained in order to determine the employer's genuine obligation and the employees' future rights.
 
 
 15
 Despite Leach's contention, neither Armco, Inc. v. NLRB, 832 F.2d 357 (6th Cir.1987), nor Esmark, Inc. v. NLRB, 887 F.2d 739, 745-47 (7th Cir.1989), is to the contrary. In Armco, the Sixth Circuit held that the Sec. 10(b) period did not commence when the employer communicated its intent to recognize another union, but only when the other union actually signed an agreement with the employer, thereby consummating the labor practices violation. 832 F.2d at 362. Similarly, in Esmark, 887 F.2d at 745-47, the Seventh Circuit held that regardless whether Postal Service applied in the refusal to bargain context, the union did not have adequate notice that the employer's plans would violate the Act until a date within the Sec. 10(b) period. Thus, neither Esmark nor Armco adopted the Postal Service "notice of intended illegal action" rule; at most these cases failed to reject that standard. Other cases, meanwhile, cast doubt on the scope of Postal Service where the existence of a final adverse action might be questioned.[5] We therefore affirm the Board's decision that the Union's advance notice of Leach's intent to withdraw recognition of the Union and repudiate the contract at Buena Park did not trigger the running of Sec. 10(b).
 
 
 16
 In the alternative, Leach contends that the Sec. 10(b) period began to run on July 3, when 35 Los Angeles workers began work at Buena Park. Leach challenges the Board's application of Harte 's "substantial completion" test in the context of the Buena Park relocation. Leach finds significant the fact that in Harte the transferees were initially outnumbered by new hires who were not subjects of the old contract, while the relevant Buena Park bargaining unit--workers on the relay manufacturing line--was comprised solely of Los Angeles transferees from the outset. In other words, Leach maintains that unlike Harte there was no new workforce to dilute the transferee workers' complement at Buena Park, and therefore Harte 's substantial completion requirement is inapplicable to Buena Park because it was evident on July 3 that the "substantial percentage" requirement had already been met.
 
 
 17
 This argument relies on an implicit but incorrect assumption that the Union had access to sufficient information about the Buena Park operation to evaluate Leach's bargaining obligations. In fact, the record is devoid of evidence that the Union knew what lay in store for relay production at Buena Park, what the appropriate bargaining unit might eventually look like, or whence its employees might ultimately come. At most, the record indicates that Leach told the Union that a majority of Los Angeles workers would be rehired at Buena Park, and that relays would be manufactured there under a just-in-time production method.[6] Leach did not provide the Union with information about the relationship between the pre-existing Buena Park employees and the Los Angeles transferees. Nor has Leach shown how the Union could independently determine the relationship between the new relay production facility and the existing Buena Park facilities.[7] In short, the record fails to show that on July 3 the Union had knowledge of the nature of the appropriate bargaining unit, let alone its ultimate composition.[8] Moreover, as the Board observed, Leach itself was primarily responsible for the Union's lack of knowledge. See 312 N.L.R.B. at 992 n. 8.
 
 
 18
 Under these circumstances, the Board reasonably treated the existing Buena Park employees as analogous to the new hires at the new facility in Harte, at least from the Union's perspective of relative lack of knowledge. In both cases, the fluid nature of a gradual relocation meant that the legal relationship of the employees, union, and employer on the first day of a transfer did not necessarily reflect their legal obligations at the conclusion of the process. The Board's application of the "substantial completion" test for purposes of determining when the Sec. 10(b) period began to run is a reasonable response to this information imbalance.
 
 
 19
 For the same reasons, Leach's contention that the Board's rule is inconsistent with Marine Optical, Inc., 255 N.L.R.B. 1241, 1981 WL 20378 (1981), enf'd, NLRB v. Marine Optical, Inc., 671 F.2d 11 (1st Cir.1982), is unavailing. Marine Optical also involved an employer who gradually relocated operations and then refused to recognize the union or adhere to the contract at the new facility. The Board determined that the company had violated the Act and that its liability for the violation dated back to the commencement of the relocation. Marine Optical, however, did not use the "substantial completion" analysis later adopted in Harte, even though the decision indicates that transferees from the old facility did not constitute a substantial percentage of the new unit until several weeks into the relocation process. Leach maintains that Marine Optical conflicts with the Harte-Leach line of decisions, and that the Board should have applied Marine Optical 's "commencement of the relocation" test to determine when the violation occurred for Sec. 10(b) purposes.
 
 
 20
 Although some tension exists between the cases, Marine Optical and the Board's decision in the instant case are hardly irreconcilable; nor do we accept Leach's argument that the Board's decision here was unreasonable. Marine Optical did not involve any issue as to the timeliness of the unfair labor practice charge under Sec. 10(b); the Board's decision instead focused on the company's challenge to the union's majority status at the new facility, where transferees were outnumbered by new hires. 255 N.L.R.B. at 1244-45. In addition, the Board's different treatment of the Sec. 10(b) trigger date and the date of an employer's remedial liability as measured by Marine Optical can be justified on the basis of comparative knowledge. When the employer begins the relocation process, it presumably knows whether its ultimate plans will require it to recognize the former site's collective bargaining agreement and might reasonably be charged with a violation of the Act at the point the relocation begins. By contrast, as here, it would be unreasonable to impute that knowledge to employees or their representative where an employer's bargaining obligations do not become manifest or otherwise known until well after the relocation process has commenced. In this context, the Board's decision to apply the Harte "wait and see" approach was reasonable.
 
 III.
 
 21
 Leach also contends that the Board erred on the merits in concluding that it violated the Act by withdrawing recognition from the Union and repudiating the Los Angeles collective bargaining contract when it moved operations to Buena Park. The test for continuity of operations in relocation cases has been likened to that used in the similar context of successorship. See Central Soya Co., Inc. v. NLRB, 867 F.2d 1245, 1247 (10th Cir.1988). In both settings, the continuity requirement ensures that despite changes in management, plant location or production techniques, workplace conditions remain sufficiently unchanged such that "the union can still fairly be presumed to command majority support in the unit." United Mine Workers of America Local Union 1329 v. NLRB, 812 F.2d 741, 743 (D.C.Cir.1987). The analysis focuses in large part on whether the " 'employees who have been retained will understandably view their job situations as essentially unaltered.' " Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987) (quoting Golden State Bottling Co. v. NLRB, 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973)). The Board's application of the continuity test, provided it is supported by substantial evidence on the record as a whole, must be enforced. See id., 482 U.S. at 42, 107 S.Ct. at 2235; Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978); see also Westwood Import Co. Inc. v. NLRB, 681 F.2d 664, 666 (9th Cir.1982).
 
 
 22
 As noted, an existing contract will follow a plant relocation provided that transferees comprise a "substantial percentage" of employees in the new plant's bargaining unit and the new plant's operations are "substantially the same" as those at the predecessor. Rock Bottom Stores, Inc., 312 N.L.R.B. 400, 402, 1993 WL 382095 (1993), enf'd, NLRB v. Rock Bottom Stores, 51 F.3d 366 (2d Cir.1995). Leach admits that the appropriate bargaining unit is composed solely of relay workers at Buena Park who relocated from the Los Angeles facility, and hence, the only question is whether the Board's finding of continuity between the two operations is supported by substantial evidence. We find that it is.
 
 
 23
 Leach maintains that its implementation of just-in-time production at Buena Park fundamentally altered the nature of its relay production operations. The ALJ, whose findings and conclusions were adopted by the Board, rejected this position after reviewing testimony on the "batch" and "just-in-time" processes. While acknowledging that just-in-time differs in several ways from the obsolete batch method used at the Los Angeles plant, the ALJ nevertheless concluded that these differences did not alter the fundamental nature of the relay operation. Instead, the judge found that the employees were readily retrained, that the end products and interim components handled by employees were identical at both plants, and that taken together, "[j]ust-in-time simply changes the way in which the product goes through the various assembly steps." 312 N.L.R.B. at 995.
 
 
 24
 Leach contends that the ALJ erred by not specifically finding that employee perceptions of their job situation were unchanged by the just-in-time process. As Leach notes, in the successorship area the court has required the Board to identify an explicit connection between operational changes and their effect on employee attitudes; simply enumerating changes without comment is insufficient. See United Mine Workers, 812 F.2d at 744. At the same time, the court implicitly recognized that such findings might be unnecessary where the relationship between operational changes and employee attitudes was self-evident. See id. (distinguishing situation where the factual findings are "so obviously relevant that the Court can avoid remanding this case for the Board to relate them in the first instance to the necessary effect on employee attitudes"). The ALJ here found that the change in job classifications and work duties at Buena Park were relatively minor and that the same employees were doing essentially the same work. Although the Board did not explicitly connect these findings to any impact on the employees' outlook, the missing link is plain.
 
 
 25
 Leach also maintains that the ALJ's finding of continuity between the two operations is unsupported by substantial evidence. Leach identifies several changes in the Buena Park workers' responsibilities and maintains that they significantly altered the overall character of the employees' work environment. In particular, Leach points to the fact that just-in-time required employees to be "cross-trained," that the new production method required employees to learn and perform multiple operations as opposed to repeating a single operation, that job classifications were changed and expanded at Buena Park, and that some employees learned to operate some new machines.
 
 
 26
 The record, however, provides ample support for the Board's conclusion that the basic character of the work environment was not fundamentally changed by the relocation to Buena Park. See 312 N.L.R.B. at 995-96. Buena Park relay workers performed the same work on the same or similar equipment, produced the same products, and worked under the same supervision as they had done at Los Angeles. Although the just-in-time method required all workers to be more flexible at Buena Park and some workers were given new job responsibilities, those changes were not so great as to outweigh the essential continuity of the workers' job content. See United Food & Comm'l Workers v. NLRB, 768 F.2d 1463, 1469-74 (1985). Unlike General Electric Co., 170 N.L.R.B. 1272 (1968), on which Leach relies, the instant case does not involve "the amalgam of ... two separate facilities" or "major personnel changes." Id. at 1273. Rather, Leach's plant relocation involved a relatively straightforward transfer of a single production line, with concomitant changes in the method of production without hiring more skilled or more educated employees. By analogy to earlier advances in manufacturing technology, the ALJ noted that when Leach changed from manual feed to automatic feed machines, reducing the number of employees and retraining others, the different manufacturing process did not give rise to a different operation. 312 N.L.R.B. at 995. The ALJ's conclusion that Leach's advance to a "just-in-time" system was a comparably incremental step is supported by substantial evidence on the record.
 
 
 27
 Accordingly, we deny the petition for review and grant the Board's cross-application for enforcement of its order.
 
 WILLIAMS, Circuit Judge, dissenting:
 
 28
 Leach's violation of the National Labor Relations Act consisted of refusing to concede that its collective bargaining agreement continued to apply to employees in its Los Angeles Relay Division after it relocated them to its facility in Buena Park. On July 3, 1991, having unequivocally stated its intention not to recognize the union that had been the workers' bargaining representative in Los Angeles, the company started the move by relocating 35 workers (of the 280 ultimately moved), who immediately resumed their work making relays in the new location. Absent certain limiting conditions (discussed below), which never developed, this refusal to recognize the union violated the Act. See, e.g., Maj.Op. at 401. Here the majority and I diverge. The majority, as I understand it, says that the six-month limitations period under Sec. 10(b) of the Act, 29 U.S.C. Sec. 160(b), did not begin to run on July 3 because on that date (and for some time thereafter) the union lacked "access to sufficient information about the Buena Park operation to evaluate Leach's bargaining obligations." Maj.Op. at 403. The trouble with this, and the nub of my disagreement, is that by July 3 the union was on notice of facts that made the likelihood of any conditions that would negate Leach's liability vanishingly remote. As Leach argued persuasively before us, see Pet.Br. at 27-29, the union was thus on notice of all it needed to know.
 
 
 29
 The majority observes that Leach failed to inform the union "what lay in store for relay production at Buena Park, what the appropriate bargaining unit might eventually look like, or whence its employees might ultimately come." Maj.Op. at 403. Concretely, this refers to the possibility that relay workers from Los Angeles might have constituted less than a "substantial percentage" of the workers in what might emerge as the appropriate bargaining unit in Buena Park. See Maj.Op. at 401. This in turn could have occurred only if the relocated workers from L.A. were combined with employees already at Buena Park, or with new hires, so that the relocated workers from L.A. did not ultimately comprise a substantial percentage of the resulting bargaining unit at Buena Park.
 
 
 30
 In fact, no such blending appears ever to have been a serious possibility. There is no indication that the relocated employees ever worked at Buena Park with employees already there in such a way as to make the whole Buena Park operation the appropriate bargaining unit. Moreover, neither the union nor the Board has suggested that there was even loose talk of any new hires being brought into the relay unit, let alone in numbers that would have cast doubt on whether, at "substantial completion" of the transfer process, the transferees would constitute a substantial percentage of the unit of relay workers. That alone distinguishes Harte & Co., 278 N.L.R.B. 947, 1986 WL 68757 (1986), see Maj.Op. at 401, 402, which involved large numbers of new hires at the outset and thus genuine doubt about the composition of the new unit until "substantial completion" of the transfer.
 
 
 31
 The 35 bargaining unit members knew, within hours of arrival at Buena Park, that they had not been blended into the old Buena Park unit and that no new workers had been hired into their unit. Of course it is possible that none of the 35 played any formal role in union activities, or even, conceivably, was a member of the union at all. But at least when the requisite information is held by a substantial number of bargaining unit members, it makes sense to attribute their knowledge to the union; after all, it is the unit members' representative. So the Fifth Circuit has held. In National Treasury Employees Union v. Federal Labor Relations Authority, 798 F.2d 113 (5th Cir.1986), the employer told employees of a new "no jeans" policy and thereafter enforced it. In applying 5 U.S.C. Sec. 7118(a)(4), a six-month statute of limitations analogous to Sec. 10(b), the court said that the announcement to employees and enforcement of the policy put the union on constructive notice of the alleged unfair labor practice. "Union stewards, at least, knew or should have known of the policy. While such knowledge may not be directly attributable to the Union, it demonstrates that the Union, in the exercise of reasonable diligence, should have been aware of the no jeans policy." 798 F.2d at 116. True, in National Treasury Employees Union the employing agency had invited the union to the announcement meeting, id., while here the company was stonewalling the union. But there is no suggestion in the Fifth Circuit decision that it turned on that, rather than on the assumed ready communications links between workers and their bargaining representatives. Indeed, one might think that Leach's intractability would have made the union especially quick to tap the information held by the workers it represented.
 
 
 32
 Moreover, it is clear that if the union had filed an unfair labor practice charge on July 3, the Board would not have rejected it as premature. In Marine Optical, Inc., 255 N.L.R.B. 1241, 1981 WL 20378 (1981), enf'd, N.L.R.B. v. Marine Optical, Inc., 671 F.2d 11 (1st Cir.1982), even though new hires initially outnumbered the transferees, the Board held that the unfair labor practice dated from the day that the company transferred the first unit members and applied to them terms and conditions different from those prescribed by the bargaining agreement.
 
 
 33
 Given the essentially undisputed evidence of what the union could readily have ascertained on July 3, the Board's application of its "substantial completion" analysis has silently dropped constructive notice out of Sec. 10(b). Accordingly, I dissent.
 
 
 
 [1]
 Leach Corp. & Int'l Ass'n of Machinists and Aerospace Workers, 312 N.L.R.B. 990, 1993 WL 398485 (1993)
 
 
 [2]
 The International Association of Machinists and Aerospace Workers, District Lodge 94, Local Lodge 102, AFL-CIO represented the Los Angeles workers and has intervened in support of the Board
 
 
 [3]
 The Union had filed the refusal to provide information charge earlier, on November 21. Leach took no exceptions to the ALJ's finding, which the Board then approved, and Leach has not contested it here. See 312 N.L.R.B. at 990 n. 3
 
 
 [4]
 Section 10(b) provides that "[N]o complaint shall issue based on any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." 29 U.S.C. Sec. 160(b)
 
 
 [5]
 See, e.g., Teamsters Local 42 v. NLRB, 825 F.2d 608, 615-616 (1st Cir.1987) ("Knowledge of a party's predisposition to commit an unfair labor practice or suspicion that, when the moment is opportune, the knife thrust will follow, is not enough to galvanize Sec. 10(b). The statute begins to run only when the impermissible act or omission--the unfair labor practice--actually takes place."); American Distributing Co., Inc. v. NLRB, 715 F.2d 446, 452 (9th Cir.1983), cert. denied, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984); NLRB v. Al Bryant, Inc., 711 F.2d 543, 547 (3d Cir.1983), cert. denied, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984)
 
 
 [6]
 Even so, the Board notes in its brief that the Union did not know exactly how many employees would be transferred, what their jobs would be, or what percentage of the total Buena Park workforce they would constitute
 
 
 [7]
 Indeed, Leach initially maintained that the Buena Park relay employees did not constitute a separate and appropriate bargaining unit. See Joint Appendix 7 (Leach Answer and Affirmative Defenses to the unfair labor practice complaint)
 
 
 [8]
 The theory relied on by our dissenting colleague--that the Union had constructive notice by virtue of what (the dissent assumes) the 35 initial transferees must have known--was not presented to the Board or in the briefs submitted to the court