Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 16, 2004      Decided October 26, 2004

No. 03-1343

EXXON CHEMICAL COMPANY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with
No. 03-1413

———

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

———

*Tony P. Rosenstein* argued the cause for petitioner. With him on the briefs were *Kathryn S. Vaughn* and *Joe Robert Caldwell, Jr.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Richard A. Cohen*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Howard E. Perlstein*, Deputy Assistant General Counsel.

Before: GINSBURG, *Chief Judge*, and EDWARDS and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: After Exxon Chemical Company ceased operating its Bayway Chemical Plant in Linden, New Jersey because it formed a joint venture, the union representing certain Bayway employees filed three grievances alleging that Exxon had violated the parties' collective bargaining agreement ("CBA"). Exxon refused to arbitrate the grievances. The National Labor Relations Board ruled that the company had violated section 8(a)(1) and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (5). Relying on *Velan Valve Corp.*, 316 N.L.R.B. 1273 (1995), Exxon petitions for review on the principal ground that its refusal to arbitrate was not an unfair labor practice as a matter of law. We deny the petition for review and grant the Board's cross-application for enforcement of its Order.

## I.

For over thirty years, the International Brotherhood of Teamsters, Local 887 ("the Union") represented the operating, mechanical, and maintenance employees at Exxon's Bayway Chemical Plant. Exxon's most recent CBA with the Union took effect on March 2, 1996, and was scheduled to expire on June 1, 1999, although it effectively terminated on December 31, 1998, due to the formation of a joint venture between Exxon and Shell Chemical Company. The formal grievance/arbitration procedures outlined in Articles 20 and 21 of the CBA defined "grievance" as "a claim by an employee or the Union that the Company has violated an express provision of this Agreement." These provisions also provided

that "[a]lthough the Company hears a claim as a grievance, it does not waive its right to take the position that the claim is not a grievance." The CBA also set time limits for the Union to act or otherwise forfeit its right to arbitrate a grievance. It further provided that "[w]hen an employee is to be laid off . . . [he/she] will receive six (6) months notice" and a severance allowance. Finally, the CBA stated, in Article 5, that "[t]his Agreement does not affect the [Company's] Benefit Program[, including its] Thrift Plan . . . or the administration thereof. This provision, however, is not a waiver of such rights as the Union has to bargain concerning these programs."

In July 1996, Exxon announced to its employees that it was forming a joint venture, Infineum, to which it intended to sell its Bayway operation. On October 31, 1996, Exxon notified the Union that all Bayway employees it represented would be laid off when the joint venture became operational. Exxon provided updates about the impending layoffs over the next two years.

During that two-year period, Exxon and the Union engaged in "effects" bargaining regarding the joint venture. The parties principally discussed whether Infineum was bound by the CBA and the extent to which it would hire the current workforce, as well as the related issues of whether and when Exxon would have to escrow or sequester monies to cover severance payments. The information that the Union received during these sessions about Infineum's formation caused it to file numerous grievances and unfair labor practice charges, including alleging that Exxon had improperly denied severance pay and retirement benefits to employees after its notice of layoff. The "effects" bargaining resulted in an agreement on November 24, 1998 ("November Agreement"). The Union agreed to withdraw its pending grievances and unfair labor practice charges "relating to the formation of Infineum" and "not to initiate or reinstitute these or substantially similar claims against Exxon in any forum whatsoever." Exxon, in turn, provided job assurances for nine unit employees and agreed to pay all employees until December 31, 1998. The agreement also stated that the

Union and Infineum would begin meeting with the aim of reaching a collective bargaining agreement by December 31, 1998, a task they accomplished on December 20, 1998.

On December 31, 1998, the last day Exxon operated its Bayway plant, Exxon laid off all unit employees and gave them their final paychecks, including severance pay. Exxon, however, did not provide a 6% matching contribution to the Thrift Fund for the severance pay as it did for regular pay, and it also decided to transfer the Thrift Fund to Infineum. On January 29, 1999, the Union orally notified Exxon of three grievances to be filed; written notification followed the next day. The grievances complained that Exxon (1) failed to provide the contractually-required six months' notice before layoff, (2) failed to match the employees' thrift contributions from severance payments, and (3) unilaterally decided to transfer the employees' thrift accounts to the Infineum savings plan. Exxon did not respond initially in writing to the grievances.

In a March 26, 1999, letter to William Goodhart, an Exxon labor relations coordinator, Union trustee Al DeFreece formally requested arbitration on behalf of the Union. Exxon responded by letter of April 29, 1999, with Goodhart rejecting the request for arbitration on the grounds that the grievances were untimely, the November Agreement precluded the notice grievance, and the grievances relating to the thrift accounts were either raised or should have been raised during "effects" bargaining. DeFreece responded by letter of May 12, 1999, requesting arbitration and that Exxon make arrangements to select arbitrators. Upon receiving no response from Exxon, the Union's attorney attempted to obtain a designation by the American Arbitration Association ("AAA"). Goodhart responded by letter of July 2, 1999, that the grievances were not arbitrable, and Exxon's attorney reiterated this position by letters of July 6, July 26, and August 10, 1999, in response to the Union's continued attempt to pursue arbitration through the AAA. When the AAA declined to proceed with arbitration, the Union filed an unfair labor practice charge on September 1, 1999, alleging that

Exxon refused to abide by the CBA's grievance/arbitration process to resolve the grievances.

After an evidentiary hearing, an Administrative Law Judge ("ALJ") found that the charge was timely because the Union did not have "clear and unequivocal notice of a violation of the Act" prior to March 1, 1999 (six months before the charge was filed on September 1), and that the "grievances are clearly covered by the grievance-arbitration provisions under the collective bargaining agreement." The Board agreed the charge was timely and, over Chairman Battista's dissent, also agreed that by refusing to select an arbitrator and to arbitrate the grievances, Exxon unilaterally abandoned or repudiated the grievance/arbitration procedure in violation of section 8(a)(1) and (5). The Board ordered Exxon to, among other things, submit the three grievances to arbitration and participate in the selection of an arbitrator. Exxon now petitions for review and the Board has filed a cross-application for enforcement of its Order.

## II.

Under section 8(a)(5) of the Act, it is an unfair labor practice for an employer to refuse to bargain with its employees' chosen representative, 29 U.S.C. § 158(a)(5), and an employer who violates section 8(a)(5) also, derivatively, violates section 8(a)(1). *See NLRB v. Centra, Inc.*, 954 F.2d 366, 367 n.1 (6th Cir. 1992); *NLRB v. Newark Morning Ledger Co.*, 120 F.2d 262, 265 & n.1 (3d Cir. 1941); *cf. Metro Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1988). The court will uphold the Board's decision whether to assert jurisdiction over an employer's refusal to arbitrate so long as it is rational and consistent with the Act, and the Board's reasoning is adequate, rational, and not arbitrary. *DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 444–45 (D.C. Cir. 2002); *see also Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271 (1964). While the Board's interpretation of the scope of the parties' contractual agreement is subject to *de novo* review, *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202–03 (1991), its findings of fact are conclusive if supported by substantial

evidence in the record as a whole, *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 834–35 (D.C. Cir. 1998); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The court will overturn the Board's adoption of the ALJ's credibility determinations only if they "are 'hopelessly incredible,' 'self contradictory,' or 'patently unsupportable.'" *Cadbury Beverages, Inc. v NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998) (quoting *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998)).

We address at the outset Exxon's contention that the unfair labor practice charge was barred by the six-month limitations period in section 10(b) of the Act, 29 U.S.C. § 160(b). The statute begins to run when the unfair labor practice occurs. *Leach v. NLRB*, 54 F.3d 802, 806–07 (D.C. Cir. 1995); *Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 614–16 (1st Cir. 1987); *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 547 (3rd Cir. 1983). Here, the unfair labor practice is Exxon's refusal to arbitrate. As the record makes clear, the Union did not request, and the employer therefore could not have refused, arbitration until March 26, 1999, which was less than six months before the Union filed the charge. Therefore, the unfair labor practice charge is timely.

As to the merits of the unfair labor practice, Exxon first contends that the Board erred as a matter of law in focusing on whether the three grievances were potentially covered by the CBA, when the question is whether the employer engaged in a wholesale repudiation of the contract. In its view, the three grievances represented, "at most," Petitioner's Br. at 12, a "narrow class" under *Velan Valve*.

The Board has long had a policy of deferring its unfair labor practice jurisdiction prospectively to an agreed upon arbitration procedure, where, for example, the dispute turns on an application of a CBA's terms. *See Hammontree v. NLRB*, 925 F.2d 1486, 1490–91 (D.C. Cir. 1991) (*en banc*) (citing *Collyer Insulated Wire*, 192 N.L.R.B. 837, 842 (1971)); *cf. Util. Workers Union v. NLRB*, 39 F.3d 1210, 1213 (D.C. Cir. 1994) (*citing Spielberg Mfg. Co.*, 112 N.L.R.B. 1080 (1955)). *Velan Valve* is an example of when the Board will

conclude that the interests favoring collective bargaining as an essentially private process are best served by the Board's nonintervention, leaving the aggrieved party to seek specific performance of the duty to arbitrate through the courts under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. In that case, the Board found no section 8(a)(5) violation where an employer had a good faith belief that a single grievance was not timely under a five-day limitations period in the parties' CBA. *Velan Valve*, 316 N.L.R.B. at 1273–74. The union had filed a subcontracting grievance more than thirty days after the employer had advised it about the subcontracting of janitorial work. *Id.* at 1273. The employer, though citing its long standing policy and intent to resolve grievances by arbitration, declined to do so in this instance because the subcontracting grievance was untimely under the parties' agreement and, in any event, lacked merit. *Id.* The Board, with one member dissenting, concluded that under these circumstances the employer's "refusal involves precisely that type of narrow, fact-bound, contractual dispute that more properly should be handled by the parties through the contract-dispute mechanism, and not by recourse to the Board." *Id.* at 1274. The employer had not announced a broad policy of refusing to arbitrate grievances generally, had participated at each step of the grievance proceeding, and had reassured the union that it remained committed to processing grievances under the parties' contract, including arbitration. *Id.*

Exxon would have the *Velan Valve* analysis apply on the grounds that the three grievances were simultaneously filed and are a "narrow class" relating to the transition of employees to Infineum. However, in its Decision, the Board adequately distinguished *Velan Valve*:

> [T]he Board [in *Velan Valve*] emphasized that the employer, at the time of its refusal to arbitrate grievances, reassured the union of its commitment to the collective-bargaining agreement and to good-faith dealing with the union. [Exxon] here provided no such assurances. Rather, it repeatedly ignored

> the Union's request to respond to the Union's arbitration requests.

*Exxon Chemical Co.*, 340 N.L.R.B. No. 51, at 3 (Sept. 29, 2003).

The Board noted that the three grievances, unlike the single grievance in *Velan Valve*, "implicated a range of contractual issues, [are] not a narrow class of issues, and constituted the totality of collective-bargaining issues pending between the parties." *Id.* While Exxon adopts the position of the dissenting member that there was only a breach of contract claim remediable under section 301, that conduct may constitute a breach remediable in the courts does not mean that the Board may not proscribe it as an unfair labor practice. *NLRB v. Strong Roofing & Insulating Co.*, 393 U.S. 357, 361 (1969). The Board quite reasonably found it significant that the parties were in an end-game situation. Exxon had sold the facility, ended its relationship with unit employees, and walked away from what was left of the CBA during a time when unit employees and the Union were most vulnerable. *Cf. Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 39–40 (1987).

Second, Exxon contends that "good faith," not arbitrability, is the relevant issue. Although good faith may be a relevant consideration, the standard for determining whether a particular refusal to arbitrate violates section 8(a)(5) remains whether the employer's conduct is "tantamount to a wholesale repudiation," *Velan Valve*, 316 N.L.R.B. at 1274, or constitutes a "unilateral modification" of the collective bargaining agreement "by imposing a noncontractual condition that [the employer] would arbitrate only those grievances that it decided should go to arbitration." *3 State Contractors, Inc.*, 306 N.L.R.B. 711, 715 (1992). This is the standard that the Board applied. Exxon's contention that it was misled by *Velan Valve* as to the standards for Board intervention for refusals to arbitrate is unpersuasive because, as the Board discussed, Exxon's refusal to arbitrate three grievances on a variety of grounds in an end-game situation is quite different than the employer's decision in *Velan Valve* not to arbitrate a single

grievance on a single procedural ground. *Amalgamated Clothing Workers v. NLRB*, 343 F.2d 329 (D.C. Cir. 1965), cited by Exxon, did not involve an abandonment of the arbitration provisions of the CBA, but instead the employer, based on erroneous legal advice, refused to arbitrate a single grievance unless the union dropped parallel unfair labor practice charges. Exxon's reliance on *Microimage Display v. NLRB*, 924 F.2d 245 (D.C. Cir. 1991), is equally unavailing because the Board found that the employer never refused to arbitrate the particular grievance. *See id.* at 250.

Third, Exxon contends that the disputed grievances were not arbitrable under the CBA. Although Exxon correctly states that "a party cannot be forced to arbitrate the arbitrability question," *Litton Fin.*, 503 U.S. at 208–09, courts construe arbitration clauses broadly, resolving doubts in favor of coverage. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960). Exxon invokes Article 5 of the CBA and the waiver of claims provision in the November Agreement to maintain that the grievances were not substantively arbitrable. Neither provision, however, is a clear statement excluding any of the subjects raised by the three grievances from arbitration, *see AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 650 (1986), and Exxon presented no evidence that the language in Article 5 was intended to give it the unfettered right to convert employee accounts to a different company without bargaining.

Moreover, "[o]nce it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions that grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley & Sons v. Livingston*, 376 U.S. 543, 557 (1964); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Therefore, as the Board ruled, Exxon's objections that the three grievances were untimely under the contract, and its claims of waiver and estoppel based on the November Agreement, are properly for the arbitrator to revolve. Exxon's assertion that the grievances concerned matters that on their face are of no consequence, and therefore were brought

in bad faith, requires no response. *See AT&T Technologies*, 475 U.S. at 649–50.

Finally, Exxon contends that it did not receive a fair hearing for two reasons, neither of which has merit. To the extent Exxon claims the ALJ excluded evidence of its good faith, Exxon has not met its burden of demonstrating prejudice, *see Desert Hospital v. NLRB*, 91 F.3d 187, 190 (D.C. Cir. 1996). The ALJ made clear at the hearing that he would rule based solely upon the parties' written correspondence after the grievances were filed. In limiting the period during which Exxon's good faith was relevant, the ALJ reasonably exercised his discretion to exclude Exxon's evidence that related to its claims of waiver and estoppel, which, as discussed, are for the arbitrator to resolve. *See Food Stores Employees Union, Local 347 v. NLRB*, 422 F.2d 685, 692 (D.C. Cir. 1969). Exxon's other objection, that the ALJ prohibited it from adequately testing DeFreece's credibility, is belied by the record, for the ALJ allowed Exxon to test DeFreece's credibility on the only issue as to which it was relevant, the section 10(b) claim.

Accordingly, we deny the petition for review and grant the Board's cross-application for enforcement of its Order.