**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**Local 1199, Drug, Hospital and Health Care Employees Union, Intervenor,**

**v.**

**ROCK BOTTOM STORES, INC., Respondent.**

**No. 888, Docket 94–4110.**

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1995.

Decided April 5, 1995.

368

Stanley L. Goodman, Roseland, NJ (Grotta Glassman & Hoffman, P.A., of counsel), for respondent.

Margaret G. Neigus, N.L.R.B., Washington, DC (William M. Bernstein, Frederick L. Feinstein, Gen. Counsel, Linda Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., of counsel), for petitioner.

K. Dean Hubbard, New York City (Eisner Goldfeder & Hubbard, P.C., of counsel), for intervenor.

Before: FEINBERG, MESKILL and McLAUGHLIN, Circuit Judges.

FEINBERG, Circuit Judge:

The National Labor Relations Board (the Board) petitions to enforce its order finding that respondent Rock Bottom Stores, Inc. (Rock Bottom) violated § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5). The central issue is the status of 12 employees who worked as trainees at Rock Bottom's store in Commack, New York, before the store was closed and relocated. The Board found that these employees qualified as "transferees" to Rock Bottom's new store. As a result, the Board concluded that a "substantial percentage" (approximately 40% or more) of the work force at the new store consisted of transferees. The "contract bar" rule therefore prohibited Rock Bottom from withdrawing recognition from or refusing to bargain with intervenor Local 1199, Drug, Hospital and

Health Care Employees Union (the Union),[1] which represented employees at the Commack store. For reasons set forth below, we enforce the Board's order.

## I. Background

According to the Board's findings, Rock Bottom operates approximately 28 retail discount stores in the New York City metropolitan area. The stores sell health and beauty aids and variety items. Rock Bottom and the Union have a long-standing collective bargaining relationship. When the instant dispute began, the Union was the bargaining representative of employees at 20 of Rock Bottom's stores and its warehouse. A three-year multi-employer collective bargaining agreement, embodied in a Memorandum of Agreement signed by Rock Bottom and the Union in November 1988, set terms and conditions of employment for bargaining unit employees at Rock Bottom's stores, including the Commack store.

In October 1989, Rock Bottom informed its Commack employees that it intended to close the Commack store and relocate to a new facility in neighboring East Northport, approximately one-quarter of a mile away. The normal Commack work force consisted of 18 employees, all of whom were offered positions at the new store; 13 employees accepted the offer to transfer. About the same time that Rock Bottom announced its decision to relocate, it began hiring new employees to staff the larger East Northport store. The new hires included replacements for the five Commack employees who did not wish to transfer. Although the East Northport store had not yet opened, most of the newly hired employees were assigned to train on cash registers that had been installed at that store. Others were assigned to train on cash registers at Commack. Rock Bottom stipulated that, "with the exception of East Northport's [greater] size, ... 'there was no substantial change in the operations at the East Northport store from what we had at the Commack store.'" Rock Bottom Stores, Inc., 312 N.L.R.B. 400 (1993). Indeed, the Commack store and its successor, the East

[1]. The Union's name now is 1199 National Health and Human Services Employees Union.

Northport store, were both designated as Store No. 50 in Rock Bottom's records.

Rock Bottom closed the Commack store on November 15, 1989 and opened the East Northport store the next day, November 16. Rock Bottom then ceased making pension and welfare fund contributions required by the collective bargaining agreement applicable to the Commack store.

The East Northport store opened with a complement of 52 employees. Among these were the 13 former Commack employees who had accepted the transfer offer, the five "replacement trainees" who had trained primarily at Commack and 12 "additional trainees." This last group had been hired expressly for the East Northport store, but trained by working at Commack for periods of time ranging from three to approximately 24 hours prior to the relocation. Thus, 30 of the 52 East Northport employees (about 57%) had spent some time working in the Commack store. Rock Bottom concedes that the 13 Commack employees and the five replacement trainees were properly treated as "transferees" from Commack but claims that the 12 additional trainees did not so qualify. Accordingly, in Rock Bottom's view only 35% of the new store employees were transferees, less than a "substantial percentage."

Three weeks prior to the November 1989 move, the Union sent Rock Bottom a letter requesting that it bargain with the Union and observe the terms of the collective bargaining agreement at the East Northport store. Rock Bottom denied the request as premature. After the move, the Union renewed its request, but Rock Bottom again refused.

In February 1990, Rock Bottom filed a petition for an election to determine whether the East Northport employees desired union representation. In March 1990, the Union filed an unfair labor practice charge against Rock Bottom alleging violations of § 8(a)(1) and (5) of the Act based upon Rock Bottom's withdrawal of union recognition and refusal to bargain with the Union or to apply the terms of the collective bargaining agreement at East Northport. In accordance with Board policy, the election petition was held in abeyance pending disposition of the unfair

labor practice charge. See American Metal Prods. Co., 139 N.L.R.B. 601, 604 (1962). In October 1991, a complaint issued, and in June 1992, an administrative law judge (ALJ) conducted an unfair labor practice hearing. The ALJ issued his decision in September 1992, finding Rock Bottom in violation of the Act.

In September 1993, the Board issued its Decision and Order agreeing with the ALJ that Rock Bottom had violated § 8(a)(1) and (5) by refusing to bargain with the Union, withdrawing recognition of the Union, and refusing to abide by its collective bargaining agreement after moving its store to East Northport. The Board relied on its earlier decision in Harte & Co., 278 N.L.R.B. 947 (1986), which stated that in keeping with the contract bar rule, "an existing contract will remain in effect after a relocation if the operations at the new facility are substantially the same as those at the old and if transferees from the old [facility] constitute a substantial percentage—approximately 40 percent or more—of the new [facility] employee complement." Id. at 948. The Board affirmed the ALJ's finding that the 12 disputed trainees qualified as transferees under Westwood Import Co., 251 N.L.R.B. 1213 (1980), enforced, 681 F.2d 664 (9th Cir.1982) and Arrow Co., 147 N.L.R.B. 829 (1964). In those cases, trainees who had worked in a facility prior to relocation were counted as transferees for purposes of determining whether transferees made up a "substantial percentage" of the new work force, even though they had worked in the former facility for only a short time. Westwood, 681 F.2d at 666; Arrow, 147 N.L.R.B. at 830–31.

The Board ordered Rock Bottom to (1) cease and desist from continuing its unfair labor practices; (2) recognize the Union as the collective bargaining representative of the East Northport employees; (3) apply the collective bargaining agreement at the East Northport store; (4) make all fringe benefit contributions as provided in the collective bargaining agreement; (5) make the East Northport employees whole for any losses they may have suffered; and (6) post a remedial notice. Thereafter, the Board petitioned to enforce its order.

## II. Discussion

We begin by addressing the standard of review. The Board's finding that an employer has committed an unfair labor practice "cannot be lightly overturned." *NLRB v. J. Coty Messenger Serv., Inc.*, 763 F.2d 92, 96 (2d Cir.1985). Such a finding "must be upheld if supported by substantial evidence in the record as a whole." *J.L.M., Inc. v. NLRB*, 31 F.3d 79, 82 (2d Cir.1994). Substantial evidence means more than a scintilla. *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir.1994) (per curiam). Moreover, the Board's findings are entitled to a "high degree of deference" when its special expertise is implicated. *Id.* Finally, the Board's application of its findings must be rational and consistent with the Act. *District Lodge 91, Int'l Ass'n of Machinists v. NLRB*, 814 F.2d 876, 879 (2d Cir.1987); *Westwood*, 681 F.2d at 666.

Rock Bottom challenges the Board's finding that the Commack collective bargaining agreement applied at the East Northport store. Under the Board's long-standing contract bar rule, "if an employer and a union have entered into a collective bargaining agreement, the agreement constitutes a bar to the holding of a representation election for the life of the agreement, up to a maximum of three years." *NLRB v. Arthur Sarnow Candy Co.*, 40 F.3d 552, 557 (2d Cir.1994); see also *Westwood*, 681 F.2d at 666; *NLRB v. Marine Optical, Inc.*, 671 F.2d 11, 16 (1st Cir.1982). The rule applies in the absence of unusual circumstances, *Westwood*, 681 F.2d at 666, and is intended to promote industrial peace by stabilizing, for a reasonable term, a contractual relationship between employer and union. *Arthur Sarnow Candy*, 40 F.3d at 557; *Corallo v. Merrick Cent. Carburetor, Inc.* 733 F.2d 248, 252 (2d Cir.1984). Thus, the rule applies even when a union has lost majority support. See *Harbor Carriers v. NLRB*, 306 F.2d 89, 92 (2d Cir.1962), cert. denied sub nom. *Deck Scow Captains Local 335 v. Harbor Carriers*, 372 U.S. 917, 83 S.Ct. 727, 9 L.Ed.2d 723 (1963); *NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 593 (2d Cir.1961). The rule prohibits employers from petitioning the Board for decertification of a union and from repudiating the contract or withdrawing recognition from and refusing to bargain with a union during the term of the collective bargaining agreement. *Marine Optical*, 671 F.2d at 16.

A workplace relocation is not the kind of "unusual circumstance" that prevents application of the contract bar rule. In relocation cases, the Board looks to evidence regarding the continuity of the bargaining unit and the employer's operations in order to determine whether the contract should bar a representation election at the new location. *Marine Optical*, 671 F.2d at 17; *Tricor Prods., Inc.*, 239 N.L.R.B. 65, 69 (1978), enforced, 636 F.2d 266 (10th Cir.1980). In *Harte*, the Board enunciated the standard quoted above that governs the application of the contract bar rule in the context of relocations. Under the *Harte* rule, in order for the contract to serve as a bar, the operations at the old and new facilities must be "substantially the same," and "transferees" must constitute approximately 40% or more of the employee complement at the new facility. *Harte*, 278 N.L.R.B. at 948.

Rock Bottom argues that the Board erred in finding that the 12 additional trainees qualified as "transferees," lifting the complement of transferees at East Northport above the 40% threshold of *Harte*. If the 12 additional trainees were not counted, then only 18 of the 52 East Northport employees—less than 40%—would qualify as transferees, and Rock Bottom would have no obligation to extend the Commack collective bargaining agreement to the East Northport store.

Rock Bottom contends that the Board was required, but failed, to establish that the 12 contested trainees performed bargaining unit work at Commack. According to Rock Bottom, the standard employed by the Board, that all the employees who worked at Commack prior to the opening of the East Northport store were transferees, gives insufficient weight to the interest of these and other newly hired workers at the new store in choosing whether to have union representation. Further, Rock Bottom claims that because the disputed trainees worked only between three and 24 hours at Commack, the Board should have inferred that they did not perform bargaining unit work there.

We do not agree. First, the Board's decision to count as a member of the old bargaining unit any employee who worked in the old store before transfer "represents the application of a long-standing rule" and is "reasonably defensible." *Westwood*, 681 F.2d at 667. Such a rule gives the parties affected by a relocation "the certainty of a clear guideline" and is consistent with the Act and with the contract bar rule's "goal of protecting stability in the collective bargaining relationship." *Id.* at 667 & n. 3; see also Arrow, 147 N.L.R.B. at 831.

Even if the Board were required to find that the 12 contested trainees performed bargaining unit work in the Commack store, such a finding would be amply supported by the evidence. The collective bargaining agreement itself suggests that trainees were expected to perform bargaining unit work. Article 4, which deals with hiring, states that "[e]mployers are required to arrange a trainee's schedule of work so that he may be enabled to attend classes during the training period and *at the same time work a full week.*" (emphasis added). In addition, Rock Bottom's own witness, Vice President Joseph Adonetti, testified that employees who trained at Commack for "a few hours" or "a couple of days" were assigned to jobs that would "give them experience handling ... live customers." This is precisely the kind of work covered by the collective bargaining agreement. Further, as the Union points out, part-time work was the norm among Rock Bottom employees, and the cashier jobs for which the trainees were hired did not require extensive training.

Rock Bottom argues that the record does not support the Board's finding that the 12 additional trainees were indistinguishable from the five replacement employees, who Rock Bottom acknowledges were properly counted as transferees under *Westwood.* This finding was based in part on the Board's view that "there is no indication in the record that these [12] employees did not receive the benefits of the collective-bargaining agreement during the time that they were employed in Commack." 312 N.L.R.B. at 402–03. Rock Bottom argues that the Board erred here because the 12 additional trainees earned a higher wage than the original Commack employees earned and received no pension or other benefits under the collective bargaining agreement. Rock Bottom maintains that because it did not apply the collective bargaining agreement to the 12 contested employees, they were distinguishable from the five replacement employees and should not have been counted as transferees.

This claim, too, is without merit. It is clear from the record that the five replacements, like the 12 disputed additional trainees, were hired, in effect, as temporary Commack and future East Northport employees and that the Board could properly treat them as indistinguishable. As the Board points out, after Rock Bottom hired workers for the East Northport store at the higher wage rate, it quickly increased the wages of the original Commack employees to the same higher level. In addition, Rock Bottom has cited no evidence that the 12 trainees were denied pension and other benefits before the East Northport store opened on November 16th, or that their benefits differed from those received by the five replacement trainees. Moreover, to the extent that Rock Bottom relies on its failure to provide benefits, it is not clear why it had the right, under the collective bargaining agreement, to withhold them. We decline to endorse the notion that Rock Bottom's failure to abide by the agreement with respect to the 12 additional trainees provides a basis for withdrawing recognition from the Union. Cf. *Armco, Inc. v. NLRB*, 832 F.2d 357, 364 (6th Cir.1987), cert. denied, 486 U.S. 1042 (1988) (employer's reliance on its own "disputed conduct" did not "undermine the reasonableness of the Board's determinations").

Moreover, other evidence clearly supports the Board's finding that the trainees were part of the Commack bargaining unit. First, as noted above, the collective bargaining agreement has specific provisions addressed to trainees, and it appears that under the agreement all new employees are considered unit members from the time of hire. In addition, Rock Bottom hired the 12 disputed employees before it opened the East Northport store. These employees were trained (at least in part) at the Commack store, and

were paid for this work. Further, Vice President Adonetti acknowledged that these employees were hired on a permanent basis and that their seniority was calculated on the basis of their first day of training—while virtually all of them were still at Commack.

Finally, we note that Rock Bottom relocated its store after concluding that its Commack site could not be expanded further. Only then did Rock Bottom decide to move its store a mere one-quarter of a mile away to East Northport. Thus, not only were the operations of the new facility substantially the same as the old, but the location, just across the town line, remained substantially identical as well. Moreover, the store continued to be designated by the number 50. Under these circumstances, the relocation was closely akin to a simple expansion. If this had been an expansion rather than a relocation, there would be no question that the contract bar rule would continue to apply since the Board reasonably presumes that new employees desire union representation in the same proportion as the existing work force. See, e.g., Pioneer Inn Assocs., 228 N.L.R.B. 1263, 1266 (1977), enforced, 578 F.2d 835 (9th Cir.1978).

Thus, we hold that the Board's application of the contract bar rule to the facts of this case was supported by substantial evidence in the record as a whole and was consistent with the Act. The application of the rule in this context strikes a reasonable balance between "the transferees' interest in retaining the fruits of their collective activity and ... the newly hired employees' interest in choosing whether or not to have union representation." Rock Bottom, 312 N.L.R.B. at 402. We have considered all of Rock Bottom's arguments, and find them unpersuasive.

The petition for enforcement is granted.