[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10006
_____

Agency No. 10-CA-038782

NATIONAL LABOR RELATIONS BOARD,

Petitioner
Cross Respondent,

versus

GAYLORD CHEMICAL COMPANY, LLC,

Respondent
Cross Petitioner,

UNITED STEEL PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,

Intervenor.

_____

Petitions for Review and Enforcement of a Decision of the
National Labor Relations Board
_____

(June 3, 2016)

Before ED CARNES, Chief Judge, JILL PRYOR, and RIPPLE,[*] Circuit Judges.

RIPPLE, Circuit Judge:

The United Steelworkers International Union ("USW") and its Local 887 (collectively "the Union") filed a complaint alleging that Gaylord Chemical Company, LLC ("Gaylord" or "the Company"), had failed to bargain collectively, had failed to provide information relevant to bargaining, had created a new job position without engaging in bargaining, and had interrogated employees about their union sympathies, all in violation of sections 8(a)(5) and (1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(5), (1).  Following a hearing, an Administrative Law Judge ("ALJ") found that Gaylord had committed the charged unfair labor practices and ordered Gaylord to bargain with the Union and to take other remedial measures.  The National Labor Relations Board ("NLRB" or "Board") affirmed the ALJ's findings of fact and conclusions of law and also adopted the recommended order.  The NLRB now petitions for enforcement of the Board's order.  Gaylord cross-petitions for review of the

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

2

Board's order and asks that we deny the Board's application for enforcement. For the reasons set forth in the following opinion, we grant the NLRB's application for enforcement and deny Gaylord's cross-petition.

# I

## A. Facts

From 2007 to 2010, Gaylord operated a chemical manufacturing facility in Bogalusa, Louisiana, where it produced Dimethyl Sulfoxide ("DMSO") and Dimethyl Sulfide ("DMS"). It employed approximately twenty production and maintenance workers in the facility. For decades prior to Gaylord's acquisition of the Bogalusa operation, the workers were represented by the USW and its designated local, which negotiated a series of collective bargaining agreements ("CBAs") on the workers' behalf. The most recent CBA, entered in 2009, provides that "[t]his Agreement [is] made and entered . . . by and between Gaylord Chemical Company, L.L.C., located at Bogalusa, Louisiana, hereinafter called the Company, and the United Steel Workers International Union and its Local No.

13-0189, hereinafter called the Union."[1] The recognition clause of the CBA states that "[t]he Company hereby recognizes the Union as the sole collective bargaining agent for all employees in the single bargaining unit as defined in the Agreement."[2] The CBA was signed by all of the officers of the USW; District Director for District 13, Michael Tourne; and the leadership of Local 189.

In February 2009, Gaylord informed its employees that it would close the Bogalusa plant and open a new facility in Tuscaloosa, Alabama, over 200 miles away. Gaylord extended job offers to all bargaining unit employees who wished to relocate. Gaylord and the Union also bargained regarding the effects of the relocation. Tourne negotiated on behalf of the workers, as he had with respect to earlier contracts.[3] During these negotiations, Claude Bloom, Gaylord's then vice president of manufacturing, advised the bargaining committee that Gaylord preferred to operate its Tuscaloosa facility without union representation.

---

[1] J. Ex. 2 at 1. The local union's number designation has changed over the years, as has ownership of the facility.

[2] *Id.*

[3] He also had represented union members in arbitration and grievance matters.

4

Beginning in September 2010, Gaylord moved substantial parts of the machinery and equipment necessary for production to the Tuscaloosa facility. In December of that year, the Tuscaloosa plant began producing DMSO, the only product produced at that facility. The Bogalusa facility closed in January 2011. Twelve bargaining unit employees permanently transferred from Bogalusa to Tuscaloosa. These twelve employees constituted almost ninety percent of the full complement of production and maintenance employees at the new Tuscaloosa facility, and they performed job functions "substantially similar to those previously performed by bargaining unit employees in Bogalusa."[4]

Even before the move began, Daniel Flippo, the USW's director for the district encompassing Tuscaloosa (District 9), sent a letter to Gaylord on August 31, 2010, requesting "to meet and bargain at your newly opened Tuscaloosa, Alabama facility."[5] "United Steelworkers," the USW's registered trademark, and "District 9" appeared on the letterhead.[6] The bottom of the letter stated "United

[4] J. Ex. 1(a) ¶12.

[5] J. Ex. 4.

[6] *Id.*

5

Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union"; it provided the address for District 9 and also the USW's website.[7]  Gaylord did not respond to the request.

Flippo sent a second letter on September 23, 2010, requesting that Gaylord meet and bargain regarding the Tuscaloosa facility.  On September 30, Gaylord's president, Paul Dennis, responded that he had conferred with counsel and was "uncertain as to the legal basis of District 9's status as the collective bargaining representative for our employees."[8]  Dennis also requested that Flippo explain this legal basis to Gaylord so that it could "assess [its] position."[9]  Flippo responded by letter dated October 19, 2010, which stated that "[t]he USW International Union is the certified bargaining representative of the employees at both of your plants located in Bogalusa, Louisiana and Tuscaloosa, Alabama.  As you know, the USW has requested to bargain the Bogalusa, Louisiana unit's relocation to Tuscaloosa,

[7] *Id.*

[8] J. Ex. 6.

[9] *Id.*

6

Alabama."[10]  Dennis responded by letter of October 25, 2010, in which he announced "Gaylord's position that *neither* the International nor District 9 is the certified bargaining representative for Gaylord's employees working at our Tuscaloosa, Alabama facility" and declined the request for bargaining and information.[11]

After the move to Tuscaloosa, Marc Smith, Vice President of Manufacturing for Gaylord, asked an employee, Doug Mitchell, to his office, purportedly to discuss leadership.  During this conversation, Smith asked Mitchell "why [he] thought [the employees] needed a union."[12] Mitchell replied, "why not[?]"[13]  Smith explained that there was more flexibility and fewer expenses without a union. When Mitchell pressed Smith as to what those expenses were, Smith responded that there were union dues for the employees and legal fees for Gaylord.

---

[10] J. Ex. 7 at 1. The letter was written on the same letterhead previously used.

[11] J. Ex. 8 (emphasis added).

[12] Hr'g Tr. 177.

[13] *Id.* at 178.

7

## B. Administrative Proceedings

After Gaylord's refusal of its request to bargain, the USW filed a charge with the NLRB on January 11, 2011, alleging that Gaylord had violated the NLRA. A second charge was filed in April 2011. The USW first reiterated the allegations concerning the failure to bargain contained in the initial charge. It also contained two additional allegations: that Smith had interrogated employees about their union sympathies and that Gaylord had made unilateral changes in working conditions, namely creating the new position of "Lead Shipper,"[14] without notice or bargaining.

An ALJ conducted a two-day hearing on the charges during which the General Counsel called two current Gaylord employees, Ronald Talley and Mitchell, as well as Flippo and Tourne. Although Smith was present during the hearing, Gaylord did not call him or any other witness. During the hearing, the General Counsel submitted, for in camera review, eight authorization cards signed

---

[14] G.C. Ex. 1(g) ¶19.

8

by employees from the Tuscaloosa facility in early 2011 indicating their continued support for representation by the USW.[15]

The ALJ ruled in favor of the Union. He found the General Counsel's witnesses to be credible and accepted their testimony. He then turned to the legal standards:

> The Board has long held that, following an employer's relocation, a union is entitled to continued recognition and to have an existing collective-bargaining agreement remain in effect, provided operations and equipment remain substantially the same at the new location, and a substantial percentage of employees at the old facility transfer to the new location. *Rock Bottom Stores*, 312 NLRB 400, 402 (1993), enfd. 51 F.3d 366 (2nd Cir. 1995), *Westwood Import Co.*, 251 NLRB 1213, 1214 (1980), enfd. 681 F.2d 664 (9th Cir. 1982). The "substantial percentage" requirement is met if the transferees from the old facility constitute at least approximately 40 percent of the new facility's employee complement. *Rock Bottom Stores* at 402; *Harte & Co.*, 278 NLRB 947, 948 (1986); *Westwood Import Co.* at 1216 fn.8.[16]

Here, the ALJ continued, Gaylord had continued to operate the Tuscaloosa facility in basically unchanged form, and the majority of its Tuscaloosa employees had

---

[15] *See* Hr'g Tr. 249.

[16] ALJ at 5–6.

9

been employed at the Bogalusa facility.  Moreover, Gaylord had not offered any evidence that the Union ever lost the support of a majority of unit employees.

The ALJ then addressed Gaylord's argument that, based on a combination of factors, it was absolved of the duty to bargain with the USW.  With respect to the first of these—"the conjunctive definition of the certified bargaining representative as both the International and its designated Local 189"—the ALJ noted that "[t]he Respondent's collective-bargaining relationship has been with the USW International, not separately with its subordinate components, whose bargaining authority and representational authority derived entirely from their affiliation with the USW International."[17]  He "therefore deem[ed] wholly lacking in merit [Gaylord's] assertion that the conjunctive definition of the certified bargaining representative in the labor agreement, and/or the post-relocation change in union district or local jurisdiction, stripped the Union of its representational status."[18]

---

[17] *Id.* at 6.

[18] *Id.*

10

The distance between the old and new facilities also did not affect the Union's status. "To hold otherwise," the ALJ explained, "would be to allow an employer to evade its collective-bargaining obligations simply by moving further away—leading to the untenable result of making relocation more onerous on unionized employee[s]."[19]

Concerning Gaylord's other points, the ALJ observed:

> The Respondent's brief fails to specify any evidence supporting its claim that the Union has an internal requirement that employees continue to express a desire for unionization. . . .
>
> Although the geographic definition in the collective-bargaining agreement was Bogalusa, there was no language "at no other locations," and other provisions in the agreement unequivocally demonstrate that the parties envisioned a dismantlement of the Bogalusa plant and transfer of its operations elsewhere. Moreover, the parties signed [a Memorandum of Agreement] regarding post-relocation employment of Bogalusa employees. As noted, the Respondent does not allege that [the] Union ever waived any rights to represent them after the relocation.
>
> Finally, the Union's decision to collect authorization cards in no way serves as an admission against interest or supports the Respondent's suggestion that the Union was required to file a representation petition to establish post-relocation majority status.

---

[19] *Id.*

11

> Indeed, the card check revealed that the Union continued to enjoy such status after the move to Tuscaloosa.
>
> Accordingly, I conclude that the Respondent was required to continue to recognize the Union and bargain with it as the collective-bargaining representative of the plant's Tuscaloosa unit employees and that its failure to do so since on [or] about October 25 violated Section 8(a)(5) and (1) of the Act.[20]

The ALJ similarly concluded that Gaylord had failed to supply information requested by the Union, that Gaylord had unilaterally created a new position without bargaining with the Union, and that Smith's summoning of Mitchell to his office and querying him concerning his desire for a union interfered with Mitchell's rights, all in violation of the NLRA. Gaylord filed exceptions to the ALJ's decision.

The NLRB affirmed the ALJ's findings and conclusions and adopted his recommended order. The Board petitioned to enforce the order, and Gaylord cross-petitioned for review. Following the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), in which the Court ruled that the NLRB lacked a legally sufficient quorum for almost all of 2012, the General Counsel

---

[20] *Id.* at 7.

moved to vacate the NLRB's order, which had been issued during this timeframe. The General Counsel asked for an immediate remand for reconsideration by the NLRB, which now had a full complement of Senate-confirmed members.  We granted the motion.

On remand, the NLRB considered de novo the ALJ's decision and the record.  It then affirmed the ALJ's rulings, findings, and conclusions and adopted his recommended order for the reasons set forth in his decision.  The NLRB again petitioned to enforce its order in this court; Gaylord filed a cross-petition for review; and the USW filed a motion to intervene, which was granted.

## II

We now turn to an analysis of the issues brought to us by the parties. The general principles governing our evaluation are well established.  "The Board's finding of an unfair labor practice 'must be upheld if it is based upon substantial evidence contained in the record taken as a whole, and based upon reasonable inferences drawn from the facts as found.'"  *Shore Club Condo. Ass'n, Inc. v. NLRB*, 400 F.3d 1336, 1338 (11th Cir. 2005) (quoting *NLRB v. Imperial House Condo., Inc.*, 831 F.2d 999, 1006 (11th Cir. 1987)).  Moreover, "[b]ecause of the

13

Board's special competence in the field of labor relations," we accord its interpretation of the Act "substantial deference" and give "special respect" to its chosen remedy. *Id.* (internal quotation marks omitted).  With respect to the Board's factual determinations, as long as its inferences from the record are "plausible . . . , we will not overturn [them], even if we would have made different findings upon a *de novo* review of the evidence." *Id.* at 1338–39 (quoting *Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1261 (11th Cir. 1999)).

### A.

### 1.

The principal focus of the parties is whether Gaylord had a duty to bargain with the USW and Local 887[21] after the relocation to Tuscaloosa.  "Generally, if an employer relocates and the new plant is considered merely a continuation of the old one, the employer must continue to recognize and bargain with the union which represented the employees at the old plant." *Lammert Indus. v. NLRB*, 578

---

[21] Gaylord's Tuscaloosa plant falls within the geographic jurisdiction of District 9 of the USW.  The parties, therefore, sometimes speak in terms of the duty to bargain with District 9, as opposed to with the Tuscaloosa local, Local 887.

14

F.2d 1223, 1225 (7th Cir. 1978). "[T]he continuity requirement ensures that despite changes in management, plant location or production techniques, workplace conditions remain sufficiently unchanged such that 'the union can still fairly be presumed to command majority support in the unit.'" *Leach Corp. v. NLRB*, 54 F.3d 802, 808 (D.C. Cir. 1995) (quoting *United Mine Workers of Am. Local Union 1329 v. NLRB*, 812 F.2d 741, 743 (D.C. Cir. 1987)). The inquiry centers "on whether the employees who have been retained will understandably view their job situations as essentially unaltered." *Id.* (internal quotation marks omitted); *Tree-Free Fiber Co.*, 328 NLRB 389, 398 (1999) (same).

In assessing whether this continuity has been established, the Board looks to whether the employer has maintained the same "operational methods, managerial hierarchy, customers, and services or products," as well as "changes in either the size, makeup, or the identity of the employee complement." *King Soopers, Inc. v. NLRB*, 254 F.3d 738, 743 (8th Cir. 2001) (quoting *Westwood Imp. Co. v. NLRB*, 681 F.2d 664, 666 (9th Cir. 1982)).[22]

---

[22] In *King Soopers, Inc. v. NLRB*, 254 F.3d 738, 743 (8th Cir. 2001), the court also identified "distance between the old and new plants" as a relevant factor. In support of this

<span>(continued…)</span>

15

Here, the parties stipulated that Gaylord "relocate[d] its equipment, supplies, materials and product to Tuscaloosa, Alabama."[23]  The Tuscaloosa facility produced DMSO, as had the Bogalusa facility.  Twelve employees from Bogalusa transferred to Tuscaloosa, where they "perform[ed] job functions substantially similar to those previously performed by bargaining unit employees in Bogalusa."[24]  The ALJ's conclusion that Gaylord "has continued to operate the

---

(…continued)

factor, the court relied upon *Westwood Import Co. v. NLRB*, 681 F.2d 664, 666 (9th Cir. 1982). In *Westwood Import*, the court did not discuss how distance factored into its analysis, but relied upon *Tricor Products, Inc.*, 239 NLRB 65, 68 (1978).  The issue in *Tricor* was whether Tricor, a successor corporation, had a continuing duty to bargain with a unit of patternmakers that had been employed by C & J, the assets of which Tricor had acquired.  In describing the differences in operation, the Board noted that "Tricor is located several miles from the former location of C & J." *Id.*  The Board nevertheless concluded accordingly:

> Tricor's patternmaking operation is almost identical with that of C & J.  When C & J closed, it transferred its operation to Tricor.  C & J's machinery and equipment were moved to Tricor, and all C & J's patternmakers were transferred to Tricor.  All work pending at C & J was moved to Tricor and finished there by using the same machinery, equipment, and employees formerly used on that work at C & J.  It is found that Tricor's patternmaking operation is a continuation of, and the same as, the patternmaking business of C & J.

*Id.*  We read *Tricor*, therefore, as standing for the proposition that the nature of operations and complement of workers are the most important factors in assessing the continuity of operations.

[23] J. Ex. 1(a) ¶10.

[24] *Id.* ¶12.

(continued…)

16

Tuscaloosa facility in basically unchanged form," therefore, is supported by the record.[25]

With respect to the size, makeup, and identity of the employee complement at the new facility, former Bogalusa employees constitute nearly ninety percent of the employees at Gaylord's Tuscaloosa plant.  This is more than double the forty percent threshold that the NLRB usually applies to determine if there is a continuity of workforce.  *See NLRB v. Rock Bottom Stores, Inc.*, 51 F.3d 366, 370 (2d Cir. 1995) (employing the NLRB's rule that, if transferees "constitute approximately 40% or more of the employee complement at the new facility," continuity of the bargaining unit has been shown).  Substantial evidence, therefore, supports the view that there was a continuity in Gaylord's operations.

## 2.

Gaylord does not dispute seriously that there was a continuation of operations between the Bogalusa and Tuscaloosa plants.[26]  Instead, the Company

---

(…continued)

[25] ALJ at 6.

17

maintains that it is no longer obligated to bargain with the USW because the CBA governing the Bogalusa employees "narrowly defined" the bargaining relationship.[27] It notes that the CBA identifies the contracting parties as "Gaylord Chemical Company, L.L.C., located at Bogalusa, Louisiana," and "the Union," defined as "United Steel Workers International Union *and* its Local No. 13-0189."[28] According to Gaylord, the "use of the conjunctive phrasing is significant because it identifies the specific local that is the certified representative," and "this phraseology is not what the union typically uses in its contracts."[29] Therefore, it maintains, when Gaylord moved outside the geographical reach of Local 189, Local 189 no longer could represent its

---

(…continued)

[26] In the statement of facts in its brief, Gaylord does note that, in Bogalusa, it manufactured both DMSO and DMS, but only manufactures DMSO in Tuscaloosa. It does not argue, however, that this fact undermines the Board's determination that there was a continuation of operations. The Company stipulated that it "relocate[d] its equipment, supplies, materials and product to Tuscaloosa," and that, at Tuscaloosa, the "employees were hired to perform job functions substantially similar to those previously performed by bargaining unit employees in Bogalusa." J. Ex. 1(a) ¶¶10, 12.

[27] Resp't/Cross-Pet'r's Br. 4.

[28] J. Ex. 2 at 1 (emphasis added).

[29] Resp't/Cross-Pet'r's Br. 7.

18

employees, and Gaylord's bargaining obligations necessarily ceased. It points to the testimony of Flippo, as well as other evidence in the record, to establish both that the language of the CBA is unique and that it represents a tripartite relationship between the employer, the USW, and Local 189.[30]

We do not believe that this evidence undermines the NLRB's determination. We do not read Flippo's testimony as suggesting that the contractual relationship between Gaylord, the USW, and Local 189 was in any way unique. During the hearing, Flippo testified:

> Q:    And who are the parties to the collective bargaining agreements between—
>
> A:    The international—the company, the international union on behalf of its locals, so its really between the company and the international, and we do it on behalf of the local.
>
> Q:    And is there any other language that you see used in that collective bargaining agreement[] when it's talking about the local and the international?
>
> A:    Some of the older contracts actually say the company and the international and its local or and the local or and its local. Most say on behalf of its local. The company and the United Steelworkers

---

[30] *See id.* at 7–8.

International on behalf of its local.  Some say the company and the international and its local or for its local. I mean, it depends on the company counsel and depending on who's sitting there talking and how you write the words . . . .[31]

Thus, according to Flippo, while the relationship between the USW, its locals, and the employees remains constant, different language may be used to describe the same relationship.[32]

---

[31]  Hr'g Tr. 87–88.

[32]  At oral argument, Gaylord argued belatedly that *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) v. NLRB*, 394 F.2d 757 (D.C. Cir. 1968), supports its claim that, given the conjunctive language of the contract, it did not have a duty to bargain with the USW or its District 9 director.  We perceive nothing in *UAW* that assists Gaylord; indeed, we agree with the General Counsel that *UAW* supports the Board's action here.

In *UAW*, Pierce Governor Company operated a production facility in Anderson, Indiana, where the employees were represented by Local 940; for several decades, the "contracts had been made between the Company 'and the International *and its Local 940*, jointly (herein called "the Union"), as the "exclusive bargaining agency" for the employees . . . .'" *Id.* at 761 (emphasis added).  The company decided to move its Anderson operation to Upland, Indiana, some thirty-five miles away. It bargained the effects of the move with Local 940, but refused "to recognize Local 940 for any purpose other than at Anderson"; the company was willing, however, to bargain with the UAW International at the new location.  *Id.*  The UAW later filed an unfair labor practice charge in which it alleged that the company had violated the NLRA "[b]y refusing to bargain *with the Anderson local* (while willing, for a time, to bargain with a different UAW local at the new location)." *Id.* (emphasis added) (internal quotation marks omitted).

The court first affirmed the NLRB's finding that the UAW International was the certified bargaining agent of the employees.  As in this case, the record did not reveal "[h]ow the Local became engrafted into the process"; nevertheless, the court held that, despite the conjunctive

(continued…)

20

Gaylord's claim also is undermined by the Board's decision in *Tree-Free Fiber Co.*, 328 NLRB 389 (1999).  In that case, the relationship between Statler

(…continued)

language in the contract, Local 940 was not an "independent bargaining entity," but "at most it was a *de facto* agent" of the International.  *Id.*  It would appear, therefore, that *UAW* does not support Gaylord's claim that the conjunctive contract language evidences a bargaining obligation with the Bogalusa local independent of the obligation with the USW.

In *UAW*, the court also considered whether, under the factual circumstances presented to it, the company had an obligation to bargain with Local 940 following the move.  It observed that, prior to the relocation, only forty (of more than 200) employees had expressed interest in transferring.  Moreover, when the new production facility opened, "[n]o Anderson employee . . . presented himself at Upland for employment at the Upland plant." *Id.* at 763 (internal quotation marks omitted).  It also was clear "that employees formerly at Anderson who were members of Local 940 did not constitute a majority of employees at Upland."  *Id.*  From these facts, the court concluded that

> the Company had reasonable grounds to believe that a majority of the people who applied and were hired at Upland did not belong to Local 940. When the Company reflected its concern and posed the question by offering to recognize any union which could show membership of a majority of its employees, the burden would seem to shift to the Union to make such a showing. Certainly the burden does not rest with the Company to show a lack of majority. *If the question had been membership in the International, perhaps a different question would be presented.* But in the situation here depicted it would seem correct to say, as the Board did, that the Union had failed to sustain its charge that the Company committed an unfair labor practice by failing to recognize Local 940 as the bargaining agent of its Upland employees.

*Id.* (emphasis added).  *UAW*, therefore, held that an employer does not violate the NLRA by refusing to bargain with a local following a relocation in which the majority of the employees chose not to transfer.  The company in *UAW*, however, had agreed to meet and bargain with the international concerning the new facility.  The court, therefore, did not address the issue presented here—whether the company's refusal to bargain with the *international*—was a violation of the NLRA.

21

Industries and its employees was governed by a CBA which provided that "this agreement is made by and between the Augusta plant of Statler Tissue Div. of Statler Industries and the United Paperworkers International Union, AFL-CIO-CLC *and* its Augusta Locals No. 82 and 57." *Id.* at 397 (emphasis added) (internal quotation marks omitted). The CBA further provided that the employer "recognize[d] the signatory Locals as the *sole collective bargaining agent* for its employees in the work which properly comes under its jurisdiction." *Id.* (emphasis added) (internal quotation marks omitted). Statler later declared bankruptcy, and Tree-Free Fiber Company purchased the mill. Following a hiatus of approximately one year, Tree-Free Fiber Company began operations. When Tree-Free Fiber Company was well into the hiring process for new employees—most of whom had been employees of Statler—the International Union sent a letter requesting that it be recognized as the exclusive collective-bargaining representative of the mill employees. Tree-Free Fiber Company refused and argued that, "because the Union's May 8 letter demanding recognition was authored by the International Union, and the parties' CBA recognizes the signatory locals as the sole collective-bargaining agent for the employees, the demand for recognition is inappropriate,"

22

and it was relieved "from any obligation to bargain with or recognize the Union."

*Id.*

The ALJ disagreed and concluded that the employer's refusal to recognize and bargain with the International Union was a violation of the NLRA.  While acknowledging the language on which Tree-Free Fiber Company rested its argument, the ALJ noted that the CBA "contains provisions that provide for the International Union to be specifically involved in settlement discussions at the last step of the grievance procedure prior to the matter being referred to arbitration." *Id.* at 398.  This language indicated that the International Union was a party to the CBA.  Additionally, there was a long history of the representatives of the International Union being involved in contract negotiations and administration. Given this history, the International Union, and not the individual locals, was the collective-bargaining representative of the Statler mill employees.  The NLRB affirmed:  "The judge also properly found that the Respondent refused to recognize and bargain with the Union as the employees' collective-bargaining representative, in violation of Section 8(a)(5) and (1)." *Id.* at 389.

23

In the present case, the argument that Local 189 is the sole bargaining agent based on the contract language is not nearly as strong as it was in *Tree-Free Fiber Company*:  Nowhere does the CBA designate Local 189 as the "sole collective bargaining agent" for Gaylord's Bogalusa employees.  Moreover, the history of the USW's involvement in the negotiation and administration of CBAs at Bogalusa is just as strong as in *Tree-Free Fiber Company*.  We therefore cannot accept Gaylord's argument that the contract language requires it to bargain only with Local 189.

### 3.

Gaylord also points to other evidence to support its assertion that its obligation to bargain extended only to the USW in conjunction with Local 189. This evidence does not undermine the NLRB's conclusion that Gaylord had an obligation to bargain with the USW in Tuscaloosa. For instance, the fact that a local has its own attorney, officers, and finances does not establish that it is a separate "union" for bargaining purposes.  USW locals are chartered by the USW

24

and must comply with its by-laws and directives.[33]  The USW dictates what officers a local may have, their terms of office, and their responsibilities—including the local treasurer's responsibilities to track "[a]ll initiation fees and dues" and deposit them "in a separate bank account to be designated as a trust fund for the International Union."[34]  Perhaps most pertinent to the issues before the court, the USW Constitution also provides that "[t]he International Union shall be the contracting party in all collective bargaining agreements and all such agreements shall be signed by the International Officers."[35]

Gaylord also points to an email from Tourne to Flippo.  According to Gaylord, the email includes a statement by Tourne "that the employees desire union representation."[36]  On the basis of this statement, Gaylord submits that there was no pre-existing duty to bargain with the employees in Tuscaloosa.  The context does not support this reading of the email.  In the email, Tourne informs

---

[33] *See* G.C. Ex. 12 at 40.

[34] *Id.* at 47.

[35] *Id.* at 69.

[36] Resp't/Cross-Pet'r's Br. 8.

Flippo where the "'demand to bargain' letter should be sent."[37]  Tourne then

concludes with the following observations:  "The local officer for the group talked

to all the employees to make sure everyone is on board.  Let me know if you need

anything else or if I can help in any way.  I have also attached a copy of the

CBA."[38]  In short, the USW acted responsibly in confirming that it continued to

enjoy support from the Bogalusa employees.  Indeed, the fact that Tourne sent the

Bogalusa CBA to Flippo is further evidence that Tourne believed the bargaining

relationship survived the relocation.

Gaylord also maintains that the USW's collection of new authorization cards

from the Tuscaloosa employees is evidence that the USW had doubts about its

continued status as the employees' bargaining agent.  It is equally plausible,

however, that the USW, facing an employer resistant to bargaining, simply was

trying to make its rights as clear as possible.  The ALJ thus was on solid ground in

---

[37]  G.C. Ex. 14.

[38]  *Id.*

26

concluding that "the card check revealed that the Union continued to enjoy [majority] status after the move to Tuscaloosa."[39]

## 4.

Finally, Gaylord argues that the NLRB's order "improperly sanctions the United Steelworkers International's transfer of jurisdiction from District 13 to District 9 *without any evidence* establishing that a majority of affected employees ratified such a transfer."[40]  It points to two cases, *Hermet, Inc.*, 222 NLRB 29 (1976), and *The Gas Service Company*, 213 NLRB 932 (1974), for the proposition that, had it acknowledged and bargained with the USW's District 9 Director in Tuscaloosa, it would have been violating the NLRA.

Gaylord's assertion is undermined, of course, by the fact that the USW collected cards from the majority of the Tuscaloosa facility indicating support for its continued representation. However, even if such evidence were not in the record, neither *Hermet* nor *The Gas Service Company* would control here.

---

[39]  ALJ at 7.

[40]  Resp't/Cross-Pet'r's Br. 10 (emphasis added).

In *Hermet*, two unions affiliated with the same international were vying to represent workers at a facility which was scheduled to be moved from the geographic jurisdiction of the first local (Local 455) to the jurisdiction of the second (Local 545).  During a strike designed to compel the company to execute a CBA, several employees signed a petition authorizing Local 455 to represent them; other employees signed cards distributed by a representative of Local 545, but the space on the cards where the local number was supposed to be written was left blank.  The agreement reached at the end of the strike designated "Shopmen's Local Union No. 455 of the International Association of Bridge, Structural and Ornamental Iron Workers (AFL-CIO)" as "the Union"; the CBA explicitly stated that "[t]he International . . . is not a party to this agreement." *Hermet*, 222 NLRB at 32 (internal quotation marks omitted).

A dispute soon arose between the locals concerning which would represent the employees once the operation was moved.  With mediation from the international, the locals concluded that jurisdiction should be transferred to Local 545.  When the employees discovered this development, however, forty-two of the sixty-eight members of the bargaining unit signed a letter expressing their

28

preference to remain with Local 455. The company nevertheless acquiesced in the transfer and began treating Local 545 as the employees' collective-bargaining representative; the employees were required to transfer their membership to Local 545 as a condition of continued employment. The employees then filed an unfair labor practice charge against Local 545 and the company. The NLRB concluded that the transfer of jurisdiction violated the employees' rights under the NLRA:

> [T]he Company and Local 545 entered into an agreement which in effect recognized Local 545 as the employees' exclusive bargaining representative and required membership therein as a condition of employment, notwithstanding the employees' preference for the Brooklyn local as manifested by their letter to the International before Respondents announced to the employees that a purported transfer of bargaining rights was to take place. Moreover, thereafter Respondents maintained and enforced that agreement.

*Id.* at 37. Such evidence, the NLRB concluded, constituted at least a prima facie case that the company and Local 545 had violated the NLRA.

Gaylord maintains that had it, like the employer in *Hermet*, negotiated with the District 9 Director in Tuscaloosa, it would have violated the NLRA. Here, however, the USW was a party to the CBA and its employee, Tourne, had been

29

active in negotiations and arbitrations on behalf of the employees at Bogalusa.

Indeed, Gaylord stipulated to the following facts:

> At all material times, since at least 2007, the International Steelworkers Union, through Michael Tourne, who also is and was at all times affiliated with District 10, sub-district 3, of the International Steelworkers Union has been a signatory to all collective bargaining agreements between the Respondent and the Union, has actively participated in all contract negotiations as the chief Union negotiator for such agreements, has engaged in contract administration and participated in grievance meetings and arbitrations on behalf of the bargaining unit.[41]

In the present case, therefore, bargaining rights were not being transferred to an organization that was a stranger to the contract. Moreover, in *Hermet*, there was affirmative evidence that the employees had chosen a specific local as their bargaining agent, to the exclusion of the international, and they did not agree with the transfer of jurisdiction. Here, by contrast, all evidence points to the conclusion that the employees wanted the USW to continue to represent their interests at the new facility in Tuscaloosa.

---

[41] J. Ex. 1(a) ¶5.

30

Equally unhelpful to Gaylord is *The Gas Service Company*, 213 NLRB 932 (1974). In that case, Local 1613 of the International Brotherhood of Electrical Workers ("IBEW") prevailed in an election against a competing union, and Local 1613 negotiated a CBA with the employer. Local 1613's business manager, however, became overwhelmed trying to represent both The Gas Service Company's employees and the employees at Kansas City Power and Light Company, and both groups of employees complained that the business manager was devoting insufficient time to their needs. These complaints came to the attention of a representative of the IBEW, who was aware that another local had an assistant business agent with several years' experience in representing clerical employees. The IBEW representative contacted the assistant business agent, William James, to see if he could assist Local 1613's business manager, and James agreed. James then met with the clerical employees of the company and told them that Local 53 would assume all assets and liabilities of Local 1613, including its current contract with The Gas Service Company. Local 1613 would revert to the task of representing only the clerical employees of Kansas City Power and Light Company as it had before. On March 26, 1974, Local 1613 conducted an election

31

among the employees as to their preference for Local 1613 or Local 53.  According

to Local 1613, the vote was in favor of Local 53.

Local 53 and Local 1613 then filed a joint petition with the Board seeking to

substitute Local 53 for Local 1613 as representative of the office clerical

employees. The NLRB denied the petition.  It noted that

> Local 53's officials, with the exception of James, have generally
> represented only outside electrical field and line employees in a wide
> variety of units in Missouri and Kansas. They are generally unfamiliar
> with Local 1613's contract with the Employer and the ordinary
> problems faced by [the] Employer's clericals in their daily routine.
> Local 1613, on the other hand, has been administering the contract
> and is familiar with the problems and conditions.

*Id.* at 933.  It could not conclude, therefore, that this was simply an

"administrative" matter, which could be addressed through a petition to the Board.

The NLRB further explained that

> [t]he petition does not assure the employees of the continuity of their
> certified bargaining representative, but rather seeks to substitute a new
> and different labor organization with its own officers and a complete
> change in the representative. Such a proposed change would raise a
> question concerning representation.…[T]hat question may only be
> considered upon the timely filing of a representation petition and a
> secret ballot of the employees concerned.

*Id.*

32

Again, the factual differences between the present case and *The Gas Service Company* are marked. Here, Gaylord stipulated that the USW has been actively involved in the representation of Gaylord employees for many years. Its representative had negotiated CBAs with Gaylord and had participated actively in administering those CBAs on behalf of Bogalusa employees. The USW is "familiar with the problems and conditions" faced by Gaylord employees, and, therefore, would provide continuity of representation to the employees that Local 53 could not provide to the employees in *The Gas Service Company*.[42]

---

[42] Gaylord also cites at length two advice memoranda from the Office of the General Counsel. "Such memoranda are intended to serve as internal instruction for use by the Office of the General Counsel, and have no precedential value or authoritative weight for administrative law judges." *U.S. Postal Serv.*, 345 NLRB 1203, 1214 n.17 (2005). Moreover, like the cases cited by Gaylord, the factual circumstances in the advice memoranda are different from the ones presented here. In *Crescent Bay Convalescent Hospital*, No. 31-CA-25999, 2003 WL 26072163 (NLRB G.C. February 26, 2003), Local 399 of the Service Employees International Union was the certified bargaining representative of employees of a convalescent home; there was no evidence that the international was a party to the CBA. At some time later, the international transferred jurisdiction over convalescent homes in Southern California to Local 434B. The General Counsel concluded that "the Employer did not have a duty to recognize Local 434B because that Union never had a majority showing. The Employer did, however, have a continuing duty to recognize Local 399 because that Union never disclaimed interest." *Id.* at 3. Here, by contrast, it is clear that the USW is a party to the CBA, that the Bogalusa local no longer is asserting an interest, and that a majority of the employees in Tuscaloosa desires that the USW continue to represent their interests.

(continued…)

33

**B.**

We turn now to the other issues raised by the parties.  As previously

discussed, Gaylord's sole argument in its cross-petition is that, following the

transfer to Tuscaloosa, it no longer had the duty to bargain with the USW.  It does

not contest the factual bases underlying the other unfair labor practices related to

bargaining.  Specifically, it does not dispute that, on August 31, September 23, and

October 19, 2010, Flippo requested that Gaylord provide the USW information

related to the terms and conditions of its Tuscaloosa employees.  It also does not

dispute that failure to provide this information violated the NLRA if it had a duty

to bargain with the USW.  *See NLRB v. U.S. Postal Serv.*, 888 F.2d 1568, 1570

(11th Cir. 1989) (holding that an employer violates the NLRA when it fails "to

provide information that is needed by the bargaining representative for the proper

performance of its duties" (internal quotation marks omitted)).  Similarly, Gaylord

---

(…continued)

The second advice memorandum involving Centra, Inc., "raise[d] the novel question of whether, after an international union has made a decision to transfer jurisdiction from one local to another, the second local succeeds to the representational rights of the first local." *Centra, Inc.*, No. 8-CA-27564, 1996 WL 138065, at *2 (NLRB G.C. January 22, 1996).  The General Counsel, however, never reached this issue because there were pending representation petitions before the Board that would resolve the issue.  *See id.*

does not contest that it created a new position of "Lead Shipper" without notifying the USW or providing it an opportunity to bargain, or that creating a new position in the bargaining unit is a mandatory subject of bargaining, *see Spurlino Materials, LLC v. NLRB*, 645 F.3d 870, 879 (7th Cir. 2011). We therefore enforce the NLRB's order with respect to these bargaining issues.

The NLRB also found that Smith had interrogated Mitchell about his union sympathies in violation of the NLRA, and it seeks enforcement of its order on this issue. Although Gaylord denies that "it unlawfully interrogated employees,"[43] it makes no argument in support of this assertion. A party must make more than a "passing reference[]" to an issue to preserve it for review. *See, e.g.*, *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). Moreover, when a party fails to contest a violation, the NLRB is entitled to summary enforcement. *NLRB v. Dynatron/Bondo Corp.*, 176 F.3d 1310, 1313 n.2 (11th Cir. 1999).

Even if this were not the case, we would affirm the NLRB's order. "An employer violates section 8(a)(1) of the Act by coercively interrogating its

---

[43] Resp't/Cross-Pet'r's Br. 5.

employees about their union activities. An interrogation is coercive if, when viewed in all the surrounding circumstances, 'its probable effect' tends to interfere with the employees' free exercise of their Section rights." *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 527 (6th Cir. 1984) (quoting *Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 819 (6th Cir. 1975)).

> In determining whether certain interrogation tends to be coercive in the totality of the circumstances, the following factors are to be considered: (1) the history of the employer's attitude toward its employees; (2) the nature of the information sought; (3) the rank of the official of the employer in the employer's hierarchy; (4) the place and manner of the conversation; (5) the truthfulness of the employees' reply; (6) whether the employer has a valid purpose in obtaining information concerning the union; (7) whether this valid purpose, if existent, is communicated to the employees; and (8) whether the employer assures the employees that no reprisals will be taken if they support the union.

*TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 416 (5th Cir. Feb. 1981);[44]

*NLRB v. McCullough Envtl. Servs., Inc.,* 5 F.3d 923, 928 (5th Cir. 1993) (same).

Here, Gaylord representatives had indicated their interest in not having a union at the Tuscaloosa facility. Once in Tuscaloosa, Smith, a vice president,

---

[44] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

summoned Mitchell to his office, questioned him directly about his support for a union, and attempted to persuade him that he and Gaylord would be better off without union representation. During the meeting, Smith did not give Mitchell any assurances that there would not be reprisals for his responses. Moreover, before the ALJ, Gaylord did not call Smith (or anyone else) as a witness to establish that Smith had a valid purpose in posing these questions to Mitchell. The ALJ relied on this evidence in concluding that "Smith's questions had the reasonably foreseeable effect of discouraging employees from supporting the Union and thereby constituted unlawful interrogation."[45] That conclusion is amply supported by the record.

## Conclusion

The evidence in the record supports the Board's conclusion that Gaylord had a bargaining relationship with the USW that pre-dated the move to Tuscaloosa, that Gaylord's operation in Tuscaloosa was a continuation of its operation in Bogalusa, and therefore that Gaylord had an obligation to bargain with the USW concerning its Tuscaloosa employees. Moreover, the record supports the NLRB's conclusion

---

[45] ALJ at 8.

37

that Smith interrogated Mitchell about his union sympathies in violation of the NLRA.  We therefore grant the NLRB's petition to enforce its order and deny Gaylord's cross-petition for review.

PETITION FOR ENFORCEMENT GRANTED; CROSS-PETITION DENIED